IN THE MATTER OF: H.D., D.D., M.D., J.D., D.D.
No. COA09-1102.
Court of Appeals of North Carolina.
Filed February 2, 2010.
This case not for publication
Jon W. Myers for Respondent Father.
Betsy J. Wolfenden for Respondent Mother.
Thomas R. Young for Petitioner Appellee Alexander County Department of Social Services.
Pamela Newell Williams for Guardian ad Litem.
STEPHENS, Judge.
Respondent Mother and Respondent Father (collectively, "Respondents") appeal from juvenile adjudication and disposition orders[1] concluding that their five children were abused and neglected and finding that it was in the children's best interests to remain in the custody of the Alexander County Department of Social Services ("DSS"). For the following reasons, we affirm.

I. Procedural History
On 16 October 2008, DSS filed juvenile petitions alleging that one-year-old Harrison, two-year-old Dawn, three-year-old Molly, five-year-old Donna, and seven-year-old Jon[2] were (1) abused in that Respondents created or allowed to be created a substantial risk of serious physical injury by other than accidental means, and (2) neglected in that the children lived in an environment injurious to their welfare. The petitions stemmed from an automobile accident which occurred on 26 September 2008 in which Respondents' nine-year-old son Hank[3] was fatally injured and their five surviving children were injured, four of them seriously. The children were originally placed in kinship arrangements, but were taken into DSS custody pursuant to a nonsecure custody order entered 23 January 2009. Currently, the children remain in DSS custody and are in foster care placements.
On 4 and 5 February 2009, the trial court conducted a hearing on the juvenile petitions. During the hearing, the trial court received testimony from two eyewitnesses to the accident, an emergency medical services ("EMS") technician, several law enforcement officers who responded to and investigated the accident, an Alexander County Health Department laboratory manager, a DSS social worker, and seven-year-old Jon. Following the hearing, the trial court entered an adjudication order on 11 March 2009 adjudicating the five children abused and neglected. The court concluded that the direct and proximate cause of the accident was Father's impairment resulting from his abuse of controlled substances. The court also concluded that Mother failed to ensure that her children were properly restrained in the vehicle and knew or should have known that her husband was impaired and unable to safely operate a motor vehicle.
The trial court conducted a disposition hearing on 2 April 2009. Following the hearing, the trial court entered a disposition order on 5 May 2009, in which the court concluded that a plan of reunification with Respondents was in the children's best interests but their return to Respondents' home at that time was contrary to the children's best interests. The trial court thus ordered that the children remain in DSS custody. The trial court also ordered Respondents to follow the recommendations of their psychological/substance abuse assessments and continue visitation with the children.
Although Respondents appealed from both the adjudication and disposition orders, Respondents' arguments to this court address only the adjudication order.

II. Factual Background and Evidence
On 26 September 2008, Respondents and their six children were traveling on Morris Creek Road in Caldwell County in the family's blue passenger van. They were on their way from Lenoir, North Carolina to their home in Alexander County. Father was driving the van and Mother was in the passenger seat. In the second row, Jon was seated on the far left behind his father, Hank was seated in the middle, and Harrison was seated on the far right behind his mother. In the third row, Dawn was seated on the far left, Donna was seated in the middle, and Molly was seated on the far right.
The road was damp and it had been raining on and off during the morning and early afternoon. Eddie Green was traveling on Morris Creek Road behind the van. He first saw the van on the side of the road, with the front of the vehicle on the roadway and the rear of the vehicle on the shoulder. The tires of the van were spinning on the shoulder. Mr. Green stopped and allowed the van to re-enter the roadway in front of him. As he followed the van, he observed the van going "in this ditch and that ditch, that ditch, this ditch. Just backward and forward. How he missed them mailboxes, I don't know . . . ." Mr. Green testified that he followed the van for approximately one mile, keeping his distance as he thought that "[i]f anybody else come, it's gonna be a head-on collision, we wanted room to stop." Mr. Green attempted to call 911 on his cell phone "to tell the 911 operator somebody [sic] needed to get down here and try to help this van, stop it and get it off the highway." Mr. Green was unable to get a cell phone signal, however.
Suddenly, the van rapidly accelerated from approximately 25 miles per hour to 55 or 60 miles per hour. Mr. Green testified that the driver "was kind of riding in the middle after he floored it, he . . . was still shaky, but he wasn't going from ditch to ditch." Mr. Green was still behind the van when he observed the van "just . . . clean[] this ditch out over here and he just, zoom, like that, he went hard left. . . . From that ditch, over to the right side. Hard left to the left, and hit that big tree, sideways." As Mr. Green stopped his vehicle and jumped out to assist the occupants in the van, he noticed another car behind the bushes on a dirt road to the left. The other vehicle was on the dirt road and was not blocking the van in any way.
The driver of that vehicle, Jeff Fox, lives near the accident site. Mr. Fox had returned home to eat lunch and was on his way back to work. As he was getting ready to pull up to the highway, he saw Respondents' van come right in front him and slam into the tree. He jumped out of his truck and went over to the driver's side door to check on the driver. Mr. Fox did not see any vehicle on the road traveling in the opposite direction of the van.
Jason Cook, a Caldwell County EMS technician, responded to the scene of the accident. When Mr. Cook arrived, he observed a number of children in the van. He also observed car seats strewn throughout the van and a large of amount of clutter and garbage inside the van. The first child he encountered, Hank, was unresponsive and showed no vital signs. A second child had an ornamental piece of silver embedded in her leg. A third child was trapped behind the back seat and door. Mr. Cook testified that, in his opinion, most of the car seats in the van were either improperly secured or inappropriate for the age and size of the children placed in them.
Trooper T.C. Williams of the North Carolina Highway Patrol also responded to the scene. When Trooper Williams spoke to Father, he noticed that Father's eyes were glazed over and his speech was slurred. Father was unsteady on his feet and nearly fell over. According to the trooper, when Father was taken into custody at the scene of the accident, he did not ask about his children but only asked for cigarettes and whether his van was drivable. Father was apparently unaware that an accident had occurred or that anyone was injured. Instead, Father claimed that he pulled the van over to turn around. Trooper Williams performed a field sobriety test on Father, which Father did not pass.
Trooper Williams then arrested Father. When Father was searched pursuant to arrest, law enforcement found approximately four pills in his possession. Father admitted to taking "Xanax, Oxycodone, and Zogor [sic]" after lunch. Father claimed to have a few illnesses, but did not indicate that he was injured as a result of the accident. Trooper Williams administered a breathalyzer test on Father, which revealed that Father was not under the influence of alcohol.
Trooper Williams then contacted Trooper Brett Marr, who was trained in drug recognition. Trooper Marr testified as a drug recognition expert at the adjudication hearing. He explained that he used a fourteen-step approach to determine whether Father was impaired, which included the administration of several tests and the evaluation of clinical indicators of impairment, such as pulse, blood pressure, body temperature, and examination of Father's pupils. Father admitted to Trooper Marr that he had taken Oxycodone, Soma, and Xanax on the day of the accident. Based on Trooper Marr's evaluation, it was his opinion that Father was impaired, was unable to operate a motor vehicle safely, and was under the influence of central nervous system depressants and narcotic analgesics.
Father consented to a blood draw and was transported to the hospital. Two vials of blood were drawn and sent to the State Bureau of Investigation ("SBI"). SBI testing revealed that the sample was positive for Oxycodone, Xanax, and Tramadol. Tramadol is a central nervous system depressant and a narcotic analgesic. The pills seized from Father's possession were also tested and determined to be Xanax.
Sergeant Derrick Dawson also arrived on the scene to assist with the investigation and took several photographs of the accident scene. Sergeant Dawson testified that he believed the vehicle was traveling at approximately 64 miles per hour at the time it veered off the road. The vehicle then traveled a short distance on the shoulder before the brakes were applied, which caused the rear of the vehicle to overtake the front. The vehicle then spun on the asphalt and continued spinning until it hit the tree.
Sergeant Dawson testified that he believed that Mother had made some attempt to restrain her children. However, notwithstanding her efforts, Mother failed to ensure that her children were properly secure and sitting in the proper seats. Trooper Dawson also testified that Mother claimed that a white car traveling in the opposite direction of the van approached the van head-on, causing Father to swerve off the road to keep from hitting the car. Additionally, Jon testified at the hearing and made a similar suggestion. Based on his investigation, Trooper Dawson did not believe that the accident had been caused by another vehicle.
Mother's purse, which was recovered from the accident scene, contained an unmarked pill bottle with five pills, a few loose pills in the bottom of the purse, a pipe with residue, and a screen. The pills, pipe, and screen were seized and sent to the SBI for testing. A lab report indicated that the pills were Ciprofloxin, Doxepin, and Oxycodone. The pipe residue was determined to be Oxycodone and Cocaine.
Nine-year-old Hank was fatally injured in the accident. Four of the five surviving children were hospitalized following the accident. Molly suffered multiple facial lacerations, a concussion, and skull fractures. She also had her left leg impaled with a piece of silver and sustained rib and clavicle fractures. She was hospitalized until 3 October 2008. Harrison was found in his car seat by the EMS technicians. He suffered a facial hematoma and was kept in the hospital for several days for observation before being released. Dawn was hospitalized with a frontal skull fracture, as well as brain and facial injuries. She remained in the hospital until 4 October 2008. Donna had seat belt marks across her chest, suffered from having her abdomen pinned by the vehicle's interior, had a laceration to the liver, and suffered skull fractures. She was released from the hospital on 1 October 2008.

III. Discussion
We first address Respondents' challenges to the trial court's findings of fact in the adjudication order.
"The allegations in a petition alleging abuse, neglect, or dependency shall be proved by clear and convincing evidence." N.C. Gen. Stat. § 7B-805 (2007). "A proper review of a trial court's finding of [abuse and] neglect entails a determination of (1) whether the findings of fact are supported by `clear and convincing evidence,' . . . and (2) whether the legal conclusions are supported by the findings of fact . . . ." In re Gleisner, 141 N.C. App. 475, 480, 539 S.E.2d 362, 365 (2000). In a non-jury abuse and neglect adjudication, "the trial court's findings of fact supported by clear and convincing competent evidence are deemed conclusive, even where some evidence supports contrary findings." In re Helms, 127 N.C. App. 505, 511, 491 S.E.2d 672, 676 (1997). "The trial judge determines the weight to be given the testimony and the reasonable inferences to be drawn therefrom. If a different inference may be drawn from the evidence, he alone determines which inferences to draw and which to reject." In re Hughes, 74 N.C. App. 751, 759, 330 S.E.2d 213, 218 (1985). The trial court's conclusions of law are reviewed de novo. In re J.S.L., 177 N.C. App. 151, 154, 628 S.E.2d 387, 389 (2006).
We initially note that while Respondents collectively challenge findings of fact 38, 40-42, and 59, they do not challenge the remaining findings of fact. Accordingly, findings of fact 13-7, 39, 43-58, and 60 are presumed to be supported by clear and convincing evidence and, therefore, are binding on appeal. In re J.D.S., 170 N.C. App. 244, 252, 612 S.E.2d 350, 355, cert. denied, 360 N.C. 64, 623 S.E.2d 584 (2005).
Father contends that findings of fact 40, 41, and 42, are not supported by clear and convincing evidence. We disagree. The challenged findings state the following:
40. The Court received some evidence regarding the existence of a white colored vehicle being present in the area of the accident and driving head[-]on towards the [family] van. Particularly, Trooper Dawson indicated that he had received some information from the Respondent Mother concerning a white car that she claims forced the family van off the road. Additionally, the Court received testimony from [Jon who] made a similar suggestion.
41. The Court finds it improbable that any such vehicle caused the [family] vehicle [to run] off the road. None of the eyewitnesses saw any such vehicle. Trooper Dawson's investigation of the accident scene and his collateral investigation ruled out the possibility of the accident being caused by a third [-]party vehicle. Additionally, the Court has reviewed photographs (particularly Petitioner's Exhibit 13D) taken from the interior of the [family] van from the vantage point of where [Jon] would have been sitting at the time of the accident. It is the Court's finding that [Jon] would not have been in a position to see anything but the dashboard of the van and therefore could not have witnessed the vehicle he claims forced the car off the road.
42. The [family] vehicle went out of control and collided with a tree due to the impairment of the Respondent Father [], an impairment caused by the abuse of controlled substances. No third[-]party vehicle was present at the time of the accident and no such vehicle caused in any way the fatal car accident which involved the [family] vehicle.
Father first contends that the portions of the findings which rule out the white car as the cause of the accident are not supported by the evidence. Specifically, Father contends that "[a] careful examination of the trial eyewitness testimony discloses that neither person's testimony eliminated the possibility of an intervening white car." This argument, at best, misapprehends the evidence.
Mr. Green was asked, "Up to the time that you saw this vehicle do that hard left that you described, did you see any other vehicle that could have countered that vehicle?" Mr. Green responded, "No. There was probably five [] minutes before any vehicle ever came down the road, either way, after the wreck."
Likewise, Mr. Fox did not see any vehicle on the road traveling in the opposite direction of the van just prior to the accident. He testified that "the way you pull up onto Moore's Creek Road, you can see the opposite direction that the van was traveling, if there's any vehicles coming that way, and that's what my automatic, first reaction is, to look left, before I look right before you pull out in the road, and I did not see another vehicle, sir." Moreover, Sergeant Dawson testified that his investigation of the accident scene and collateral investigation ruled out the accident being caused by a third-party vehicle.
We conclude that this testimony was sufficient evidence to support the trial court's finding that the accident was not caused by a third-party vehicle. Although there was evidence to the contrary, it is the trial judge who determines the weight and credibility to be given to evidence, including which inferences to draw and which to reject. Hughes, 74 N.C. App. at 759, 330 S.E.2d at 218.
Father also contends that there is insufficient evidence to support the finding that the accident was caused by Father's impairment and not a third-party vehicle. However, as explained above, there was clear and convincing evidence to support the trial court's finding that the accident was not caused by a third-party vehicle. Additionally, the undisputed findings of fact establish that Father was impaired by "prescribed and non-prescribed controlled substances" at the time of the accident. Accordingly, Father's argument is overruled.
Finally, Father challenges the portion of finding of fact 41 in which the trial court found that Jon would not have been able to see an oncoming vehicle. The trial court based this inference on a photograph taken from the interior of the van after the accident. We agree with Father's contention that it is difficult to discern what Jon would or would not have been able to view, based on that photograph alone and, thus, this portion of the finding is not supported by clear and convincing evidence. Nonetheless, because there was clear and convincing evidence to support the trial court's finding that no white car caused the accident, this portion of finding number 41 is superfluous to the trial court's determination that the accident was not caused by a third-party vehicle. Accordingly, any error is nonprejudicial. Father's assignments of error are overruled.
Next, we turn to Mother's arguments that findings of fact 38 and 59 are not supported by clear and convincing evidence. We disagree. Finding of fact 38 states:
38. Based on [Trooper Dawson's] observations, which took place after the children had already been extracted from the vehicle, he formed a belief that the Respondent Mother had made some attempt to properly restrain her children. However, the Court finds that, notwithstanding such efforts, it was her obligation to assure that all of the children were properly secured and sitting in proper car or booster seats, something she failed to do.
Sergeant Dawson testified that he believed Mother attempted to restrain the children in booster and car seats. Sergeant Dawson also testified that it was ultimately Mother's responsibility to ensure that the children were properly restrained. In his opinion, at least two of the children were not properly restrained. While he explained that very few people actually properly restrain their children, based on improper installation, vague manufacturer instructions, and failure to receive formal training, this opinion does not relieve Mother of her responsibility to ensure the safety of her children.
Furthermore, Mr. Cook testified that, in his opinion, some of the children were not properly restrained in their seats, based on the types of injuries they sustained. Mr. Cook also testified that some of the child seats recovered from the van were inappropriate for the ages and sizes of the children.
Finally, Mr. Fox testified that the car seats were "scattered all over the place" in the van. In his opinion, based on his observations, the only child seat secured to the car was the infant seat. We conclude that this evidence is clear and convincing evidence to support finding of fact 38.
Finally, Mother challenges finding of fact number 59, which states the following:
59. The Respondent Mother knew or should have known that her husband was impaired and unable to safely operate a motor vehicle. By taking no steps to intervene and by allowing the Respondent Father to drive with her children as passengers, the Respondent Mother is equally responsible for the injuries the children sustained as well as the exposure to serious physical injury one of her children suffered.
Mother argues that this finding is not supported by clear and convincing evidence because both she and Jon claimed that the accident was caused by an oncoming white car. However, as we have already concluded, the testimony of Mr. Green, Mr. Fox, and Sergeant Dawson was sufficient to support the trial court's finding that the accident was not caused by a third-party vehicle. Although Mother and Jon testified to the contrary, it is the trial judge who determines the weight and credibility to be given to evidence, including which inferences to draw and which to reject. Id. Moreover, the undisputed findings of fact establish that Father was impaired by controlled substances at the time of the accident. Accordingly, there was sufficient evidence to support finding of fact 59 and Mother's argument is overruled.
Next, we turn to Respondents' challenge to the trial court's conclusion of law which states the following:
2.Clear, cogent and convincing [evidence] exists to find that the minor children . . . are abused and neglected children in that the children were exposed by the parents to serious bodily injury by other than accidental means, that they were not provided proper care and were exposed to an injurious environment.
Father's sole argument regarding this conclusion of law is that once findings of fact 40, 41, and 42 are excluded, the factual basis for this conclusion is eviscerated. Likewise, Mother's sole argument regarding this conclusion is that once findings of fact 38 and 59 are excluded, the factual basis for this conclusion is eviscerated. However, as we have already determined that findings of fact 38, 40, 41 (in pertinent part), 42, and 59 are supported by clear and convincing evidence, Respondents' arguments are meritless. Accordingly, the orders of the trial court are affirmed.
AFFIRMED.
Judges CALABRIA and STROUD concur.
Report per Rule 30(e).
NOTES
[1] We note that neither Respondent Mother's nor Respondent Father's notice of appeal references the correct dates of the orders from which they appeal. While it is clear from the record that they appeal from the "initial order of disposition and the adjudication order upon which it is based[,]" N.C. Gen. Stat. § 7B1-001(a)(3) (2007), we chastise trial counsel for the appellants for such carelessness and admonish counsel to exercise better care in designating the orders from which appeal is taken.
[2] Pseudonyms are used to protect the privacy of the children.
[3] A pseudonym is used to protect the privacy of the child.